### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WEI FU, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:12-CV-01444 (JCH) |
| v. | : | |
| | : | MARCH 31, 2014 |
| ISO INNOVATIVE ANALYTICS, | : | |
| Defendant. | : | |

**RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 40)**

## I.    INTRODUCTION

Plaintiff Wei Fu ("Fu") alleges that, during his period of employment with defendant Insurance Services Office, Inc. ("ISO"),[1] he was subjected to quid pro quo and hostile work environment sexual harassment in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Connecticut General Statutes, section 46a-60(a)(8).  Notice of Removal ("Notice") (Doc. No. 1) at 15; Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp.") (Doc. No. 52) at 22.  Fu further alleges that ISO terminated him, in part, because of his sexual orientation, also in violation of CFEPA per Connecticut General Statutes, section 46a-81(c).  Notice at 13-14.  ISO has moved for summary judgment on both of these claims.[2]  Defendant's Motion for Summary Judgment ("Def.'s Mot. for Summ. J.") (Doc. No. 40).

---

[1] Defendant Insurance Services Office, Inc. ("ISO") observes that it was improperly identified as "ISO Innovative Analytics" in plaintiff Wei Fu's ("Fu") Complaint.  Defendant's Memorandum in Support of Motion for Summary Judgment ("Def.'s Mem.") (Doc. No. 41) at 1.

[2] ISO also requests that Fu's claims for back pay and front pay be dismissed because Fu admitted that he obtained immediate subsequent employment at a higher salary than what he received at ISO and thus did not suffer any lost wages attributable to ISO.  Def.'s Mem. at 21. The court, however, finds a request to limit damages, prior to any determination that Fu is actually entitled to damages, premature, and declines to reach this issue.

## II.    FACTUAL BACKGROUND

### A.  Fu's Employment with ISO

Starting in June of 2009, ISO employed Fu as Director of Customs Analytics, a subdivision of ISO's Innovative Analytics division ("IIA").  Defendant's Amended Local Rule 56(a)1 Statement ("Def.'s L.R. 56(a)1 Stmt.") (Doc. No. 45) at ¶¶ 1-2, 6; Plaintiff's Local Rule 56(a)2 Statement ("Pl.'s L.R. 56(a)2 Stmt.") (Doc. No. 55) at § 1, ¶¶ 1-2, 6. Fu worked from his home in Avon, Connecticut, travelling when necessary to Jersey City, New Jersey and San Francisco, California, where several Customs Analytics employees were located.  Def.'s L.R. 56(a)1 Stmt. at ¶¶ 3, 6; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶¶ 3, 6.  As Director of Customs Analytics, Fu was responsible for supervising six Analysts in the subdivision and was tasked with serving as the technical lead during presentations of IIA's products to regulatory agencies and potential customers.  Def.'s L.R. 56(a)1 Stmt. at ¶¶ 8-9; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶¶ 8-9.

David Cummings ("Cummings"), Vice President of Research for IIA and head of Customs Analytics, was Fu's direct supervisor and responsible for evaluating Fu's performance throughout his employment.  Def.'s L.R. 56(a)1 Stmt. at ¶ 7; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 7.  Dale Halon ("Halon") was Vice President of Sales for IIA and was not Fu's direct supervisor.  Def.'s L.R. 56(a)1 Stmt. at ¶ 12; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 12.  ISO insists that Halon did not evaluate Fu; Fu asserts that Halon evaluated his performance with respect to interfacing with actual and potential customers, and that Halon provided Cummings with his assessment of Fu's performance in that area.  Def.'s L.R. 56(a)1 Stmt. at ¶ 12; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶¶ 7,12.

2

B.  Fu's Allegations of Sexual Harassment

While Fu admits that he did not discuss his sexual orientation at IIA or tell any of his co-workers that he was gay, he denies that no one at IIA knew that he was gay. Def.'s L.R. 56(a)1 Stmt. at ¶ 13; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 13.  He specifically alleges that Halon knew that he was gay.  Id.

Beginning in July 2009, Fu sent emails to a group of IIA employees, including Halon, requesting feedback on a document Fu had prepared.  Def.'s L.R. 56(a)1 Stmt. at ¶ 18; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 18.  Fu and Halon exchanged emails regarding the document over the next few days.  Id.  In early August 2009, Fu sent Halon an email requesting additional information, and concluded the email by writing: "if you could help out, I will treat you dinner [sic] next time you come to Hartford.  ☺."  Def.'s L.R. 56(a)1 Stmt. at ¶ 19; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 19.  Fu denies that this email was an invitation to Halon to dinner.  Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 19.  Halon responded, "I give [sic] it a go.  It would be a treat for me to join you for dinner.  You treat or Dutch. Count on it."  Def.'s L.R. 56(a)1 Stmt. at ¶ 20; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 20.  The following day, Halon and Fu exchanged emails regarding dinner:

> Halon: What kind of food do you like?
> Fu: Almost anything, as long as it's not too spicy.  How about you?
> Halon: Can you cook?  LOL.
> Fu: Certainly sir.  Come on by!
> Halon: I'd enjoy that.  Let me know what you're cooking and I will bring a wine that matches.

Def.'s L.R. 56(a)1 Stmt. at ¶ 21; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 21.  In mid-November of 2009, Halon emailed Fu requesting his personal email address, which Fu provided. Def.'s L.R. 56(a)1 Stmt. at ¶ 22; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 22.  Fu testifies that he

had given his personal email address to other ISO employees in the past.  Def.'s L.R. 56(a)1 Stmt. at ¶ 23; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 23.

Fu does not allege that Halon's emails to him in July and August, or the email requesting his personal address in November, were individually discriminatory or sexual; he instead avers that these emails, when considered alongside with emails sent thereafter to his personal email account, were sexual and discriminatory in nature. Def.'s L.R. 56(a)1 Stmt. at ¶ 24; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 24.  On the same day he requested Fu's personal email address, Halon sent an email to Fu's personal account asking Fu if he had "chatted online before."  Def.'s L.R. 56(a)1 Stmt. at ¶ 25; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 25.  Fu responded, "Got it.  Yes, I have when I was younger.  LOL.  Not much anymore.  Too busy."  Id.  Halon then replied, "I ask, because I wondered if we ever did."  Def.'s L.R. 56(a)1 Stmt. at ¶ 26; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 26.  Fu did not respond to this.  Id.  Within minutes of sending the last email, Halon sent Fu another email stating, "I know this is weird.  Sorry."  Id.  ISO asserts that this email from Halon ended the exchange; Fu states that the exchange was ended by his ignoring Halon's previous email.  Id.  Fu avers that Halon's reference to online chatting referred to sexual chat boards, and that he ignored Halon's email because he believed it to be a sexual advance.  Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 26.  He notes that Cummings understood Halon to be referencing sexual chat boards, and claims that Halon's apology was an admission that he had made an unwanted sexual advance to Fu.  Id.

Two days later, Halon sent Fu an email at work stating, "Dinner, [sic] I will be traveling alone.  Was going to stay downtown, but I may stay closer to you to save the drive at night.  I have to drive to Boston in the morning."  Def.'s L.R. 56(a)1 Stmt. at ¶

27; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 27.  Fu responded, "I actually have an appointment

on that night and won't be able to make it.  Sorry about that.  Enjoy your stay!"  Def.'s

L.R. 56(a)1 Stmt. at ¶ 28; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 28.  Fu claims that, after

receiving the aforementioned email from Halon, he scheduled an appointment so that

he could honestly tell Halon that he had plans.  Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 28.

After this email, there were no further email communications regarding dinner, or other

emails of a personal nature, exchanged between Halon and Fu.  Def.'s L.R. 56(a)1

Stmt. at ¶ 29; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 29.

Fu recalls meeting Halon in-person three times during his employment with ISO:

1) at a lunch meeting in June 2009 shortly after his hire, with Cummings also in

attendance, 2) at an "all hands" meeting in San Francisco in January 2010, and 3) in the

hallway of ISO's Jersey City office sometime in 2010.  Def.'s L.R. 56(a)1 Stmt. at ¶ 16;

Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 16.  During the January 2010 meeting, Fu claims that

Halon "winked" once and smiled at him.  Def.'s L.R. 56(a)1 Stmt. at ¶ 17; Pl.'s L.R.

56(a)2 Stmt. at § 1, ¶ 17.  Fu found the wink and smile inappropriate in light of his prior

email exchanges with Halon, and believed the wink and smile to be of a romantic of

sexual nature.  Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 17.

Fu also alleges that, on various occasions, Halon invited him on business trips.

Pl.'s L.R. 56(a)2 Stmt. at § 2, ¶ 3.  Fu asserts that there was no need for him to go on

the trips and, thus, that he understood the requests to be an attempt by Halon to

develop a personal and sexual relationship with him.  Id. at ¶ 4.  He insists that he

refused the offers to go on these trips because he felt that Halon was trying to initiate a

romantic or sexual relationship with him.  Id. at ¶ 5.  ISO claims that Halon only invited

5

Fu to "a handful" of in-person sales meetings, at the request of Cummings, to help improve Fu's sales performance, and that these meetings never materialized. Defendant's Response to Plaintiff's Statement of Disputed Material Facts ("Def.'s Reply to Pl.'s L.R. 56(a)2 Stmt.") (Doc. No. 61) at ¶¶ 3-5.  It maintains that the sales meetings were necessary to improve Fu's sales skills and were not an attempt by Halon to develop a personal or sexual relationship with Fu, and that Halon never attempted to initiate a romantic or sexual relationship with Fu by inviting him to these meetings.  Id.

Lastly, Fu states that, during a preparatory telephone call for a sales presentation in October of 2010, Halon told Fu, with two other employees listening, that he "d[idn't] have to wear anything [to the sales call]; no one will see you."  Def.'s L.R. 56(a)1 Stmt. at ¶ 30; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 30.  Fu testified that he considered the comment inappropriate.  Def.'s L.R. 56(a)1 Stmt. at ¶ 31; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 31.  ISO notes that Fu did not characterize the comment as a sexual advance during his testimony.  Id.  Fu avers that he always believed the comment to be of a sexual nature, and that, in describing the comment as inappropriate, he meant that it was sexual harassment.  Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 31.

Fu was aware of ISO's harassment policy, and that he could report any alleged harassment to Human Resources.  Def.'s L.R. 56(a)1 Stmt. at ¶ 32; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 32.  He notes, however, that ISO's sexual harassment policy imposes no time limit on reporting harassment.  Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 33.  Fu did not advise anyone at ISO of Halon's emails or alleged harassment until October 2010, after Cummings informed him that Halon had criticized his performance.  Def.'s L.R. 56(a)1 Stmt. at ¶ 33; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 33.  At this time, Fu shared with

Cummings the November 2009 emails he exchanged with Halon.  Id.  Fu states that he

also told Cummings about Halon winking at him.  Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 33.

He further asserts that, at the time the alleged harassment from Halon occurred, he was

a new employee who had been in his position for six months, and that he knew that

Halon was his superior and had input on his performance evaluations.  Id.  He claims

that he was not aware that Halon had taken any adverse action against him until his

meeting with Cummings in September 2010.  Id.

After Fu showed Cummings the emails he received from Halon, Cummings made

it clear that Fu did not need to meet Halon for dinner and would not be required to travel

with him.  Def.'s L.R. 56(a)1 Stmt. at ¶ 34; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 34.

Cummings did not tell Halon, before Fu's termination, about Fu's disclosure of these

emails to him.  Def.'s L.R. 56(a)1 Stmt. at ¶ 31; P5.'s L.R. 56(a)2 Stmt. at § 1, ¶ 35.  Fu

observes that, despite Cummings' understanding that Fu was uncomfortable with the

emails and his interactions with Halon, Cummings did not discuss the matter with

Human Resources or anyone else at IIA until after discussions about terminating Fu

began.  Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 35; id. at § 2, ¶ 31; Def.'s Reply to Pl.'s L.R.

56(a)2 Stmt. at ¶ 31.  Cummings testified that he did not believe that the emails were

sexual in nature or constituted sexual harassment of an employee.  Def.'s L.R. 56(a)1

Stmt. at ¶ 36; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 36.  Cummings, however, also testified

that he thought the emails might be of a sexual nature and that he found them "odd."

Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 36; Declaration of Diane Windholz ("Windholz Decl.")

(Doc. No. 42) at Ex. C, at 32:5-6, 32:12-16, 32:20-24.

C.  Fu's Alleged Performance Deficiencies

The parties dispute whether Fu, as a Custom Analytics Director, was responsible for preparing and presenting the technical features of IIA products during presentations to regulatory agencies.  ISO states that doing so was expected of Fu.  Def.'s L.R. 56(a)1 Stmt. at ¶ 37.  Fu asserts that, while presentations to regulatory agencies were an aspect of his position when he was hired, he was not solely responsible for the technical section of the presentations; according to Fu, this was a shared responsibility among many teams and employees.  Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 37.

During the first six months of his employment, Fu participated in three to five "rehearsals" for presentations with regulatory agencies and attended two of these presentations in-person.  Def.'s L.R. 56(a)1 Stmt. at ¶ 38; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 38.  Cummings, Mark Richards ("Richards"), a fellow IIA Director and Fu's peer, and Mary Vansise ("Vansise") and John Reynolds ("Reynolds"), both from the Government Relations division of ISO, were also in attendance at the two in-person presentations. Id.  Cummings testified that Vansise and Reynolds described Fu's presentation style during the rehearsals as condescending and overly technical.[3]  Def.'s L.R. 56(a)1 Stmt. at ¶ 39; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 39.  Vansise, the head of ISO's Government Relations division, also told Cummings that she was not comfortable with Fu performing

---

[3] Fu argues that Cummings' testimony regarding feedback he received on Fu from Mary Vansise and Mark Reynolds is inadmissible hearsay.  Pl.'s Opp. at 5.  This statement strikes the court, however, as admissible under the present sense impression hearsay exception of Federal Rules of Evidence 803(1).  The statement further goes to show that Cummings' reason for terminating Fu was non-discriminatory; as evidence of Cummings' state of mind, it is not hearsay.  See Zubrow v. Solvay Pharmaceuticals, No. 03CV1929, 2005 WL 288381, at *7 (D. Conn. Feb. 7, 2006) (finding that statements and exhibits used as basis for termination were not hearsay but were instead indicative of the motivation for the decision to terminate).

any government presentations,[4] and selected Fu's subordinate, Doug Wing ("Wing") and Richards to perform these presentations. Def.'s L.R. 56(a)1 Stmt. at ¶ 40; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 40. Fu was never selected to participate in any government presentation with a regulatory agency. Def.'s L.R. 56(a)1 Stmt. at ¶ 41; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 41.

Fu notes that Cummings never informed him of the negative feedback from Vansise and Reynolds, and that this feedback was never documented in written form, included in Fu's formal evaluation, or mentioned during his termination phone call. Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 39. Fu also denies that Wing and Richards were selected to replace him during government presentations; he claims that he shared responsibility for these presentations with Wing and Richards, and that Wing and Richards were already participating in these presentations before he joined IIA. Id. at § 1, ¶¶ 40-41.

Fu recalls performing only one formal sales presentation during his employment with ISO, but he participated in several sales calls. Def.'s L.R. 56(a)1 Stmt. at ¶ 42; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 42. In 2009, Cummings participated in a sales presentation for which Fu was the technical lead; he observed that, during the presentation, Fu was overly technical, long-winded, and that he missed the point of the customer's questions. Def.'s L.R. 56(a)1 Stmt. at ¶ 43; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 43. Fu avers that Cummings did not discuss these observations with him, and that this feedback was never documented in writing, included in Fu's formal evaluation, or mentioned during his termination phone call. Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 43.

---

[4] See id.

9

Wing reported to Cummings on several occasions that he believed that Fu was ineffective as a leader, and that he felt that he was being asked to "take a step back" so that Fu could perform what were Wing's functions.  Def.'s L.R. 56(a)1 Stmt. at ¶ 44; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 44.  Fu, however, states that Cummings told him that Wing had criticized his prior predecessor, Wing had applied for Fu's position as Customs Analyst Director before Fu was hired, and that Wing had applied for another Director position in IIA but was not selected.[5]  Pl.'s L.R. 56(a)2 Stmt. at § 2, ¶¶ 91-94.  After Fu was notified of his termination, Wing again applied for Fu's position.  Id. at § 2, ¶ 98; Def.'s Reply to Pl.'s L.R. 56(a)2 Stmt. at ¶ 98.

Other ISO staff also allegedly complained to Cummings about Fu's work performance.  Parnav Sharma ("Sharma"), a direct report to Fu, advised Cummings that the staff viewed Fu as merely a messenger for Cummings rather than a director who added value.  Def.'s L.R. 56(a)1 Stmt. at ¶ 47; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 47.  In the summer of 2010, Richards complained to Cummings that he believed Fu acted only as a "message taker;" Richards also described Fu as indecisive and ineffective.  Def.'s L.R. 56(a)1 Stmt. at ¶ 45; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 45.  ISO claims that Cummings and Fu specifically discussed that other staff had told Cummings that they viewed Fu merely as his messenger; Fu denies this claim.  Def.'s L.R. 56(a)1 Stmt. at ¶ 47; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 47.  Ronald Lang ("Lang") expressed similar concerns to Cummings about Fu's performance and poor telephone interactions.  Def.'s L.R. 56(a)1

---

[5] ISO appears to contend that Fu's testimony on what Cummings told him about Wing is inadmissible hearsay.  Def.'s Reply to Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 92-94.  The court concludes that, as these statements are offered against ISO and were allegedly made by Cummings, as an employee of ISO's, on a matter within the scope of his employment, they fall within the opposing party hearsay exclusion of Federal Rules of Evidence 801(d)(2)(D).

Stmt. at ¶ 48; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 48.  Halon spoke with Cummings on several occasions about Fu's performance on sales calls and his belief that Fu was not performing well.[6]   Def.'s L.R. 56(a)1 Stmt. at ¶ 49; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 49.

ISO asserts that, after each conversation Cummings had with ISO staff regarding Fu's performance, Cummings advised Fu about the feedback he was receiving; ISO also states that Cummings repeatedly instructed Fu that he needed to improve his communication skills and performance as a Director.  Def.'s L.R. 56(a)1 Stmt. at ¶ 50. Fu denies that he was ever notified of any of the concerns raised by Wing, Sharma, Lang, or Halon, and that Cummings only informed him of Vansise's criticisms of his government presentation in 2009.  Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 50.  Cummings testified that he specifically informed Fu that he needed to build a relationship with all of the departments and gain the trust and confidence of the salespeople, and that he suggested that Fu engage in more face-to-face meetings with customers.  Def.'s L.R. 56(a)1 Stmt. at ¶ 51; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 51.  Fu denies that Cummings ever advised him to change his performance in order to gain the salespeople's trust and confidence.  Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 51.

ISO salesperson Bill Starkey reported that he frequently bypassed Fu with questions he had regarding client questions and sales presentations, and directed these questions to Wing instead, because Fu performed poorly when communicating with clients.  Def.'s L.R. 56(a)1 Stmt. at ¶ 52; Declaration of William Starkey ("Starkey Decl.")

---

[6]   Fu argues that Cummings' testimony regarding comments made to him by other ISO staff regarding Fu's performance is inadmissible hearsay.  Pl.'s Opp. at 5-6.  As these statements have been offered to show that Cummings had a legitimate basis for terminating Fu, however, and not for their truth, they are not hearsay.  Zubrow, 2005 WL 288381 at *7; supra note 3.

(Doc. No. 43) at ¶ 3.  Wing confirms that members of the sales team often brought such questions to him instead of Fu.  Def.'s L.R. 56(a)1 Stmt. at ¶ 52; Declaration of Doug Wing ("Wing Decl.") (Doc. No. 44) at ¶ 7.  Fu denies this, and asserts that members of the sales team frequently chose to speak with him about technical questions and sales presentations, that he was frequently complimented for its efforts and assistance, and that, with the exception of Halon, no member of the sales team criticized his performance until Halon advised Cummings and others that he could no longer work with Fu.  Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 52.  Fu further notes that all members of the sales team were subordinate to Halon with respect to Custom Analytics-associated work.  Id.

ISO provides annual Performance Reviews of its employees.  Id. at § 2, ¶ 37; Def.'s Reply to Pl.'s L.R. 56(a)2 Stmt. at 37.  Fu's 2009 Performance Review took place in or around March 2010.  Pl.'s L.R. 56(a)2 Stmt. at § 2, ¶ 38; Def.'s Reply to Pl.'s L.R. 56(a)2 Stmt. at ¶ 38.  The parties dispute whether this Performance Review took place after many of Fu's alleged deficiencies occurred.  Pl.'s L.R. 56(a)2 Stmt. at § 2, ¶ 39; Def.'s Reply to Pl.'s L.R. 56(a)2 Stmt. at ¶ 39.  Prior to conducting the Performance Review of Fu, Cummings prepared a written Performance Review.  Pl.'s L.R. 56(a)2 Stmt. at § 2, ¶ 40; Def.'s Reply to Pl.'s L.R. 56(a)2 Stmt. at ¶ 40.  The written Review contained a number of performance goals, including providing support to sales activities, developing and maintaining strong working relationships, and effectively managing staff, as well as a rating of job competencies within the areas of communication, teamwork, and customer service.  Pl.'s L.R. 56(a)2 Stmt. at § 2, ¶¶ 42, 44, 46, 48, 50, 51, 53, 55; Def.'s Reply to Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 42, 44, 46, 48,

50, 51, 53, 55; Declaration of Theodore Heiser ("Heiser Decl.") (Doc. No. 53) at Ex. F.

In all areas, the Review states that Fu's performance met job requirements, exceeded

these requirements, or was outstanding.  Pl.'s L.R. 56(a)2 Stmt. at § 2, ¶ 57; Heiser

Decl. at Ex. F.  Cummings, however, testified that he omitted from the Review any

mention of inadequacies in Fu's performance because it was Fu's first Review, Fu had

only been working at ISO for less than one year, and he wanted to give Fu a chance to

improve.  Def.'s Reply to Pl.'s L.R. 56(a)2 Stmt. at ¶ 43.

      In or around September of 2010, Cummings met with Fu to discuss the areas in

which Fu needed to improve, including his interactions with sales; Fu insists that the

meeting concerned more than just his need for improvement, and that he and

Cummings discussed numerous subjects.  Def.'s L.R. 56(a)1 Stmt. at ¶ 53; Pl.'s L.R.

56(a)2 Stmt. at § 1, ¶ 53.  Cummings suggested that Fu become more involved in sales

calls and attempt to attend calls in person; he also informed Fu that he needed to

operate more at a "director level," by providing his vision for projects.  Def.'s L.R. 56(a)1

Stmt. at ¶¶ 54-55; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶¶ 54-55.  ISO asserts that Cummings

made these suggestions to help Fu improve his perception with customers and other IIA

team members, and to address his subordinates' lack of confidence in him; Fu denies

that Cummings ever told him that he was poorly perceived by customers or other IIA

team members or that his subordinates lacked confidence in him.  Def.'s L.R. 56(a)1

Stmt. at ¶¶ 54-55; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶¶ 54-55.  Fu also asserts that no

customers ever complained about his performance.  Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 55.

      In late October 2010, Fu participated by phone in a formal sales presentation

with a prospective client, Progressive Insurance; Halon, Starkey, and another

salesperson, Gerry Kolb ("Kolb"), attended the presentation in person.  Def.'s L.R. 56(a)1 Stmt. at ¶ 56; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 56.  Halon and Starkey each testified that, after the Progressive call, they individually told Cummings that Fu had not performed well during his portion of the presentation and was circular, indirect, overly-technical, and long winded.  Def.'s L.R. 56(a)1 Stmt. at ¶ 57; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 57; Declaration of Dale Halon ("Halon Decl.") (Doc. No. 60) at ¶ 6; Starkey Decl. at ¶ 5.  Cummings claims that he spoke with Kolb and Starkey before deciding to terminate Fu, and that he considered Starkey's feedback, as well as criticism from Kolb, in reaching this decision.  Def.'s Reply to Pl.'s L.R. 56(a)2 Stmt. at ¶ 59.

Fu asserts that Cummings told him that he did not speak with Kolb and Starkey until after he had spoken with Halon; Fu also claims that Cummings did not speak with Kolb and Starkey until after the decision to terminate him had been made.[7]  Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 57.  Halon, Fu notes, was a direct supervisor to Starkey and a superior to Kolb.  Id.  Halon testified that he never instructed or advised Kolb or Starkey to speak with Cummings regarding Fu's performance during the Progressive call; Starkey states that he has no recollection of being instructed or advised by Halo to speak with Cummings about Fu's performance.  Def.'s L.R. 56(a)1 Stmt. at ¶ 58; Halon Decl. at ¶ 8; Starkey Decl. at ¶ 6.  Fu denies this, and he alleges instead that Starkey advised him that Halon had convened a meeting of Kolb and Starkey to discuss his feelings about Fu.[8]  Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 58.  ISO denies that Starkey told Fu

---

[7] ISO appears to contend that Fu's testimony on what Cummings told him about when he spoke with Kolb and Starkey is inadmissible hearsay.  Def.'s Reply to Pl.'s L.R. 56(a)2 Stmt. at ¶ 58.  Fu's statement is admissible under Federal Rules of Evidence 801(d)(2)(D).

that Halon convened such a meeting, or that such a meeting took place.  Def.'s Reply to
Pl.'s L.R. 56(a)2 Stmt. at ¶ 86.

Following the Progressive call, Halon told Cummings that he could not, and
would no longer, work with Fu on customer interactions.  Def.'s L.R. 56(a)1 Stmt. at ¶
59; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 59; Halon Decl. at ¶ 7.  Halon, however, did not
recommend Fu's termination.  Id.

D.  Fu's Termination

On November 2, 2010, Cummings spoke with Fu by phone about Halon's
decision not to include Fu on any future sales calls.  Def.'s L.R. 56(a)1 Stmt. at ¶ 60;
Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 60; Windholz Decl. at Ex. C, at 57:3-11.  Cummings
testified that, during that call, he informed Fu that if he was unable to participate in sales
calls, which were a critical part of his position, he would not be able to perform his job.
Def.'s L.R. 56(a)1 Stmt. at ¶ 60; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 60; Windholz Decl. at
Ex. C, at 57:11-18.  Fu denies that Cummings told him that ISO would be unable to
utilize a director who could not perform sales presentations; he states that Cummings
advised him that, "Dale said he did not want to work with you anymore . . . . I cannot
have a director Dale doesn't want to work with."[9]  Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 60.
He further asserts that Cummings admitted that Halon alone had concerns with Fu's
performance on the Progressive call, and that Cummings thought Fu had handled the
presentation as he had been trained to do so.  Id. at § 2, ¶ 89.  Cummings denies that

---

[8] ISO appears to contend that Fu's testimony on what Starkey told him is inadmissible
hearsay.  Def.'s Reply to Pl.'s L.R. 56(a)2 Stmt. at ¶ 86.  Fu's statement is admissible under
Federal Rules of Evidence 801(d)(2)(D).

[9] ISO appears to contend that Fu's testimony regarding what Cummings told him about
Fu is inadmissible hearsay.  Def.'s Reply to Pl.'s L.R. 56(a)2 Stmt. at ¶ 90.  Fu's statement is
admissible under Federal Rules of Evidence 801(d)(2)(D).

he told Fu this.  Def.'s Reply to Pl.'s L.R. 56(a)2 Stmt. at ¶ 89.  According to Fu, Halon's allegedly stated inability to work with Fu was the only reason Cummings mentioned in this phone call for terminating Fu.  Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 60.

Two days later, Cummings met with Nicola Hayward ("Hayward") from Human Resources to discuss Fu's performance deficiencies and consider offering Fu a three-month transition period prior to his termination or a part-time researcher role at ISO.[10] Def.'s L.R. 56(a)1 Stmt. at ¶ 61; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 61.  Parties dispute when Cummings made the decision to terminate Fu.  ISO claims that this decision was made on November 5, 2010; Fu asserts that the decision was made on October 29, 2010, when Halon advised Cummings that he could no longer work with Fu, in light of Cummings' testimony that he had no choice but to remove Fu from his Director position. Def.'s L.R. 56(a)1 Stmt. at ¶ 62; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 62.  Fu testified that he called Hayward on November 2, 2010 to notify her of Cummings' decision to terminate him.  Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 62.

In mid-November of 2010, Cummings sent Fu an email summarizing the two previous discussions he had had with Fu, outlining the various issues that led to Fu's termination, including his poor communication with customers and regulators, and informing Fu that he could remain employed at ISO for three months while he transitioned out of his position with the company.  Def.'s L.R. 56(a)1 Stmt. at ¶ 63; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 63.  Fu claims that this email was the first documentation prepared by Cummings of any of Fu's alleged performance deficiencies, that none of

---

[10] Fu claims that no other terminated employees were offered transition periods; however, he cites to a section of Cummings' deposition that is not included in the record. Pl.'s L.R. 56(a)(2) Stmt. at ¶ 61; compare id. (citing to Windholz Decl. at Ex. C, at 60-62) with Windholz Decl. at Ex. C.

these deficiencies were mentioned during the November 2, 2010 call, and that they were added as a basis for his termination after the decision to terminate had been made.  Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 63.  ISO asserts that Cummings, Hayward, and the President of IIA all attempted to locate other employment opportunities within ISO for Fu, and that Fu declined the positions offered to him by Cummings.  Def.'s L.R. 56(a)1 Stmt. at ¶ 64.  Fu denies that Cummings offered him any positions and states that Cummings told him it would be awkward for Fu to remain with IIA, and that he didn't want to put Fu in such a situation.  Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 64.

On January 5, 2011, at the conclusion of the three-month transition period afforded to Fu, Fu resigned his employment.  Def.'s L.R. 56(a)1 Stmt. at ¶ 65; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 65.  During that three-month period, Fu avers that he was required to perform all of the same duties he was responsible for prior to his termination, and that these duties included attending sales calls.  Def.'s L.R. 56(a)1 Stmt. at ¶ 61; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 61.  ISO denies that Fu performed or was required to participate in any further sales calls after he was notified of his termination.  Def.'s Reply to Pl.'s L.R. 56(a)2 Stmt. at ¶ 69.

### III.    STANDARD OF REVIEW

A motion for summary judgment is properly granted only if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  Thus, the role of the district court in deciding a summary judgment motion "is to determine whether genuine issues of material fact exist for trial, not to make findings of fact."  Id.  In making this determination, the court must resolve all ambiguities and draw

all inferences in favor of the party against whom summary judgment is sought.  See

Garcia v. Hartford Police Dep't, 706 F.3d 120, 127 (2d Cir.2013).

"The moving party bears the burden of establishing the absence of any genuine

issue of material fact." Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d

Cir.2010).  Once the moving party has satisfied that burden, to defeat the motion "the

party opposing summary judgment . . . must set forth 'specific facts' demonstrating that

there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir.2009)

(quoting Fed. R. Civ. P. 56(e)).  "For summary judgment purposes, a 'genuine issue'

exists where the evidence is such that a reasonable jury could decide in the non-moving

party's favor." Cambridge Realty Co., LLC v. St. Paul Fire & Marine Ins. Co., 421 F.

App'x 52, 53 (2d Cir.2011); see also Rojas v. Roman Catholic Diocese of Rochester,

660 F.3d 98, 104 (2d Cir.2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

252 (1986)) (stating that the non-moving party must point to more than a mere "scintilla"

of evidence in its favor).  "[U]nsupported allegations do not create a material issue of

fact." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir.2000).

**IV.    DISCUSSION**

A.  Sexual Orientation Discrimination Claim

Employers cannot discharge or discriminate against employees because of their

individual sexual orientation under CFEPA.  Conn. Gen. Stat. § 46a-81c.  In evaluating

state anti-discrimination claims, Connecticut state courts look to federal case law

interpreting Title VII of the Civil Rights Act of 1964, title 42, United States Code, section

2000e et. seq., for guidance.  State v. Commission on Human Rights and Opportunities,

211 Conn. 464, 469-70 (Conn. 1989).  Thus, an intentional discrimination claim under

CFEPA is evaluated under the same analysis applied to claims of Title VII

discrimination. Cutler v. Stop & Shop Supermarket Co., LLC., 513 Fed. Appx. 81, 82

(2d Cir. 2013).

Where there is no direct or overt evidence of discriminatory conduct as here, a

Title VII claim of discrimination must survive the three-part burden-shifting test

established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) to withstand a

motion for summary judgment. McDonnell, 411 U.S. at 802, 804; Weinstock v.

Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000). Under this test,

> [A] plaintiff first bears the "minimal" burden of setting out a prima facie
> discrimination case, and is then aided by a presumption of discrimination
> unless the defendant proffers a "legitimate, nondiscriminatory reason" for
> the adverse employment action, in which event, the presumption
> evaporates and the plaintiff must prove that the employer's proffered
> reason was a pretext for discrimination.

McPherson v. New York City Dept. of Educ., 457 F.3d 211, 215 (2d Cir. 2006). To

establish a prima facie case of discrimination under Title VII, Fu must show that 1) he

was within the protected class; 2) he was qualified for his position; 3) he experienced

adverse employment action; and 4) that action occurred under circumstances giving rise

to an inference of discrimination. Weinstock, 224 F.3d at 42.

ISO has argued that Fu cannot create prima facie case because he cannot

establish that he was qualified for his position as Director of Customs Analytics. Def.'s

Mem. at 9-10. To determine whether a plaintiff was qualified for his or her position, the

court must examine:

> the criteria the employer has specified for the position. Thus, in cases of
> alleged discriminatory discharge, [the Second Circuit] ha[s] occasionally
> analyzed this element in terms of whether plaintiff shows 'satisfactory job
> performance' at the time of discharge. . . . Whether job performance was

satisfactory depends on the employer's criteria for the performance of the job. . . .

Thornley v. Penton Pub., Inc., 104 F.3d 26, 29 (2d Cir. 1997) (internal citations omitted). Whether Fu was performing the duties of his position satisfactorily at the time of his termination is a genuine issue of disputed fact.

ISO contends that Fu was terminated because he had failed to fulfill his responsibilities as Director of Customs Analytics, that is, he had performed no government presentations and could not effectively participate in sales presentations, and his subordinates and Cummings both believed that he was an ineffective manager. Def.'s Mem. at 10-11.  Cummings, however, testified that, before the Progressive call and Halon's notice to him subsequently that he would not allow Fu to participate in any future sales calls, he had no intention of terminating Fu.  Windholz Decl. at Ex. B, at 141:9-11.  According to Cummings, his decision to terminate Fu was made because of Fu's inability to be involved on future sales calls, thus preventing Fu from "performing an essential function of the job."  Id. at Ex. B, at 141:12-17; id. at Ex. N.  Cummings' testimony is inconsistent with ISO's assertion that Fu was terminated because of his inefficacy as a manager or his failure to perform any government presentations.  It is consistent, however, with Fu's report that he was advised by Cummings, during their November 2, 2010 call, that Cummings could "not have a director [Halon] doesn't want to work with."  Pl.'s Opp. at 10; Windholz Decl. at Ex. A, at 208:10-16.

Though ISO claims that Halon and other members of the sales team repeatedly complained about Fu's performance on sales calls in the period leading up to his termination, it has submitted no documentation of any of these complaints.  Fu's 2009 Performance Review, conducted in March of 2010, makes no mention of any such

20

complaints.  Heiser Decl. at Ex. F.  Prior to the Progressive call, Cummings could only recall speaking with Halon and, possibly, Lang, an ISO Sales Manager; he did not remember any specific critiques regarding Fu from Lang.  Windholz Decl. at Ex. C, at 20:18-24, 21:20-21.  Fu claims that he was unaware of Halon's criticisms of his work performance until his September 2010 meeting with Cummings, and that Cummings had never informed him of any negative feedback from the other members of the sales team.  Windholz Decl. at Ex. A, at 185:19-22.

While ISO also claims that Fu's subordinates and Cummings both expressed doubts about Fu's management abilities, documentation of these doubts is similarly absent from the record.  Def.'s Mem. at 11.  ISO notes that Wing, Richards, and Sharma all raised concerns about Fu's leadership capacity to Cummings; however, it has submitted only testimony from Wing in support.  See Wing Decl. at ¶ 6.  Fu has provided his own testimony regarding Wing that, if believed by a jury, would undermine Wing's credibility.  Def.'s Reply to Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 92-94.  Fu has also denied that Cummings ever informed him of criticisms—regarding his management abilities—from Wing, Richards, or Sharma.  Fu Decl. at ¶¶ 28-29.

Further, the record contains no documentation of criticism regarding Fu's failure to conduct government presentations. Fu's 2009 Performance Review makes no mention of this deficiency, despite the fact that Fu had completed four mock government presentations months before his Review was conducted.  Heiser Decl. at Ex. F; Windholz Decl. at Ex. B, at 76:23-25; 77:1-2.  Cummings testified that, after these mock presentations, Vansise told him that she was not comfortable with Fu performing the government presentations, and he agreed.  Windholz Decl. at Ex. B, at 74:2-13.

However, when precisely this decision was made is unclear from the available record. Id. at Ex. B, at 76:1-3 (Cummings noting that the shift in responsibility for government presentations from Fu to Wing occurred "less than a year [since] he started"); id. at Ex. B, at 76:18-25 (Cummings observing that the decision to not involve Fu in government presentations "might have been [made] around May of 2010).

The only memorialization of any of the negative feedback ISO insists Fu received throughout his tenure at ISO is a note written by Cummings recording criticism from Kolb and another co-worker.[11]  Windholz Decl. at Ex. M.  The note is dated November 1, 2010.  Id.  ISO and Fu disagree on when the decision to terminate Fu was made.  Fu claims that Cummings reached this decision on October 29, 2010, after Halon informed him that Fu would not be permitted to participate on any future sales calls; ISO asserts that the decision was not made until November 2, 2010, after Cummings had considered the complaints made to him by Halon, Starkey, and Kolb.  Pl.'s Opp. at 18; Def.'s Mem. at 17-18.  Neither Starkey nor Kolb, however, informed Cummings that they would bar Fu from participating in future sales calls; nor does it appear that they, as subordinates to Halon, would have had the authority to do so.  See Starkey Decl. at ¶ 6; Windholz Decl. at Ex. M.

Given the lack of documentation of any of the alleged complaints about Fu's management abilities or work performance prior to November 2010, at or just after the decision to terminate Fu was made, the court cannot conclude, as a matter of law, that

---

[11] The note identifies this co-worker as "Mark."  Windholz Decl. at Ex. M.  Cummings testified that Mark Richards, an IIA director, complained about Fu's general performance as a manager in the summer of 2010.  Def.'s 56(a)1 L.R. Stmt. at ¶ 45.  Starkey, however, also testified that, following the Progressive call, he informed Cummings that Fu had not performed well during the presentation, and that he was indirect, overly technical, and long-winded.  Starkey Decl. at ¶ 5.

Fu's performance at the time of his termination was unsatisfactory and, thus, that he was unqualified for his position at ISO.  A triable issue of fact exists on this matter.

Whether a reasonable jury could infer discrimination from the circumstances of Fu's termination also raises a genuine issue of material fact.  Fu has asserted that discriminatory intent can be inferred from his termination because it would not have occurred but for Halon's criticisms of his performance, Halon's criticisms directly extended from Fu's rebuffing of Halon's sexual advances towards him, and he would not have been subjected to these advances were he not gay.  Pl.'s Opp. at 13.

ISO contends that Cummings, who was responsible for making the ultimate decision to terminate Fu, had no awareness of Fu's sexual orientation, and that his lack of knowledge precludes any inference of discriminatory intent.  Def.'s Mem. at 12.  Fu, however, asserts that it was Halon who was aware of his sexual orientation.  Pl.'s Opp. at 13.  Though Halon denies that he had knowledge of Fu's sexual orientation, a reasonable jury could find that Halon's emails to Fu amounted a sexual advance, and thus that Halon was aware that Fu was gay.

Fu further argues that Halon's negative evaluation of Fu's performance on the Progressive call was motivated by Fu's sexual orientation, and thus that his termination was motivated by his sexual orientation.  Pl.'s Opp. At 14.  In so arguing, he appears to advance a "cat's paw" theory of ISO's liability for Halon's bias.  In cases proceeding under this theory, "a plaintiff typically seeks to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision."  Rajaravivarma v. Bd. of Ct. State Univ. Sys., 862 F.Supp.2d 127, 149 (D.Conn. 2012).

In considering the applicability of "cat's paw" liability to a claim of employment discrimination under the Uniformed Services and Reemployment Rights Act (USERRA), the Supreme Court has held that "if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." Straub v. Proctor Hosp., 131 S.Ct. 1186, 1194 (2011) (emphasis in original omitted).  An act is a proximate cause of the ultimate employment action if "some direct relation between the injury asserted and the injurious conduct alleged" exists, and the link between the injury and the injurious conduct is not "too remote, purely contingent, or indirect." Id. at 1192 (quoting Hemi Group, LLC v. City of New York, 559 U.S. 1, 9 (2010)).

Though Straub involved the USERRA, courts in this circuit have extended its holding to the employment discrimination context.  See Rajaravivarma, 862 F.Supp.2d at 149-50 (applying Straub to Title VII claim and citing cases wherein other courts that have done the same); Hasemann v. United Parcel Service of America, Inc., No. 3:11CV554, 2013 WL 696424, at *10-11 (D. Conn. Feb. 26, 2013) (applying Straub to ADEA claim).  Further, while the Second Circuit has never formally adopted the "cat's paw" liability theory, it has recognized that "the impermissible bias of a single individual at any stage of [an employment decision-making process] may taint the ultimate employment decision . . . . even absent evidence of illegitimate bias on the part of the ultimate decision-maker, so long as the individual shown to have the impermissible bias playing a meaningful role in the [employment decision-making] process." Bickerstaff v.

Vassar College, 196 F.3d 435, 450 (2d Cir. 1999).  The "cat's paw" liability theory is fully consistent with Bickerstaff.  See Hasemann, 2013 WL 696424 at *11.

The record shows that Halon reported to Cummings that Fu would not be permitted to participate on future sales calls; that shortly thereafter, Cummings informed Fu that he could "not have a director [Halon] doesn't want to work with"; that Fu was terminated either the day of Halon's report to Cummings or a few days afterwards; and that Cummings testified that he had no intention of terminating Fu prior to the Progressive call.  Windholz Decl. at Ex. B, at 138:23-25, 139:1; id. at Ex. C, at 5:17-21; id. at Ex. B, at 139:9-22; id. at Ex. A, at 202: 18-21, 208:10-16; id. at Ex. N; id. at Ex. B, at 141:9-11.  Even if Cummings also received negative feedback from Kolb and Starkey regarding Fu's performance on the Progressive call prior to reaching his decision to terminate Fu, the record does not reflect that Kolb or Starkey refused, or had the authority to refuse, to allow Fu to participate in future sales calls, as discussed above. Thus, a reasonable jury could find that Halon was a "proximate cause" of Cummings' decision to terminate Fu.

To establish that his termination occurred under conditions giving rise to an inference of discrimination, Fu must produce "evidence that suggests a nexus between allegedly discriminatory conduct by [his] supervisors and the decision to terminate [his] employment."  Morales v. ATP Health & Beauty Care, Inc., No. 3:06CV01430, 2008 WL 3845294, at *6 (D. Conn. Aug. 18, 2008).  As evidence of Halon's discriminatory conduct, Fu cites Halon's emails to him in July, August, and November of 2009, Halon's wink and smile at him during a January 2010 in-person meeting, Halon's repeated invitation of him on allegedly unnecessary business trips, and Halon's criticisms of his

25

performance at some point in 2010 prior to the October 2010 Progressive call.  Pl.'s

Opp. at 14-15.  ISO argues that Halon's emails to Fu were merely "stray remarks," that

Halon's invitation of Fu on business trips was prompted by Cummings' request that he

do so to improve Fu's sales performance, and that Halon regularly invited other

employees to in-person sales meetings. Def.'s Reply at 5-6; Starkey Reply Decl. at ¶ 3.

The "stray remarks" doctrine acknowledges that "the more remote and oblique

the remarks [cited as evidence of discrimination] are in relation to the employer's

adverse action, the less they prove that the action was motivated by discrimination. . . .

The more a remark evinces a discriminatory state of mind, and the closer the remark's

relation to the allegedly discriminatory behavior, the more probative that remark will be."

Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111, 115 (2d Cir. 2007).  "When,

however . . . other indicia of discrimination" are presented along with remarks pertaining

to a protected class, characterizing these remarks as "stray" is inappropriate.  Danzer v.

Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998); see also Tomassi, 478 F.3d at 115.

To evaluate whether a remark is probative or merely "stray," a court may

consider 1) who made the remark, 2) when the remark was made in relation to the

employment decision at issue, 3) the content of the remark, and 4) the context in which

the remark was made.  Henry v. Wyeth Pharmaceuticals, Inc., 616 F.3d 134, 149 (2d

Cir. 2010).  No one of these factors is dispositive.  Id. at 150.  ISO argues that Halon's

emails to Fu were stray remarks because they were facially unrelated to Fu's sexual

orientation and too far removed from Fu's termination to allow for an inference of

discrimination.  Def.'s Mem. at 12-13.  As noted above, a reasonable jury could find that

Halon was attempting to make a sexual overture to Fu in his emails, and, thus, that his

emails concerned Fu's sexual orientation.  No conclusion can be reached on the temporal proximity of Halon's emails to Fu's termination, however, as the record is unclear on when exactly Halon's allegedly discriminatory conduct ended and when his criticism of Fu's performance began.

Fu has alleged that Halon's discriminatory conduct—in the form of invitations to business trips, a wink and smile at an in-person meeting, and his comment that Fu need not wear anything for their sales call—continued in 2010, and that Halon's criticism of his work performance began at some point in 2010 prior to Fu's termination in November 2010.  Pl.'s Opp. at 15.  Cummings testified that he spoke with both Fu and Halon about Fu traveling with the sales team in September of 2010.  Windholz Decl. at Ex. B, at 130:25, 131:1-6.  Nothing in the record suggests that Cummings spoke with Halon about inviting Fu on business trips prior to this date.  That Halon testified that he invited other employees to in-person sales meeting does not alone rule out the possibility that a reasonable jury might infer discrimination from Halon's invitation of Fu on these trips.  As for when Halon's criticisms of Fu began, Cummings testified that, "throughout 2010 the feedback [from Halon regarding Fu] started to become more pointed and more direct . . . ."  Id. at Ex. B, at 106:16-17.  The Second Circuit has recognized that evidence showing that remarks regarding a plaintiff's protected class made over a year prior to that plaintiff's termination, if part of a sequence of events culminating in a plaintiff's discharge, can suffice to preclude summary judgment.  Danzer, 151 F.3d at 55-56.  Fu's proffer could permit a reasonable jury to find that Halon's remarks were part of such a sequence, and thus to infer a discriminatory motive for his termination.

ISO has proffered a legitimate non-discriminatory basis for Fu's termination, i.e., his failure to perform any government presentations, his alleged inability to fulfill Director-level duties, and his allegedly inadequate performance on sales calls generally as well as on the Progressive call.  Def.'s Mem. at 15-19; see Khan v. Bank of America, N.A., 372 Fed. Appx. 216, 218 (2d Cir. 2010) (finding that performance errors about which plaintiff had been warned, in part, was a legitimate, non-discriminatory reason for termination).  Given the lack of documentation of any of the criticism ISO claims Fu received prior to his termination regarding his management abilities, performance on sales calls, or failure to conduct government presentations, and Cummings' testimony that Halon's refusal to allow Fu on future sales calls was the basis for his decision to terminate Fu, a reasonable jury could find ISO's offered explanation for Fu's termination false, and thus, pretextual.  See Saulpaugh v. Monroe Community Hospital, 4 F.3d 134, 142 (2d Cir. 1993) ("[A] factfinder's disbelief of a defendant's proffered rationale may allow it to infer the ultimate fact of intentional discrimination in some cases.").  Taking the record as a whole, the court cannot conclude that no reasonable jury could find that Fu was terminated due to his sexual orientation.    Thus, summary judgment is denied on Fu's sexual orientation discrimination claim.

B.  Sexual Harassment Claim

CFEPA prohibits the use of an employee's submission to or rejection of unwelcome sexual advances as a basis for employment decisions affecting said employee.  Conn. Gen. Stat. § 46a-60(a)(8).  Unwelcome sexual advances that have the purpose or effect of creating an intimidating, hostile, or offensive working environment are also a form of impermissible employment discrimination under CFEPA.

Id.  "[A] plaintiff seeking relief for sexual harassment may . . . proceed under two theories: (1) quid pro quo, and (2) hostile work environment."  Karibian v. Columbia University, 14 F.3d 773, 777 (2d Cir. 1994), cert denied, 512 U.S. 1213 (1994).  Fu has argued that Halon's unwanted sexual advances towards him, and Halon's subsequent complaints to Cummings regarding Fu's performance, amount to both quid pro quo[12] and hostile work environment sexual harassment.  Pl.'s Opp. at 22-26.

     1.  Quid Pro Quo

"[T]o establish a prima facie case of quid pro quo harassment, a plaintiff must present evidence that [he] was subject to unwelcome sexual conduct, and that [his] reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions[,] or privileges of [his] employment."  Karibian, 14 F.3d at 777.  In examining whether a nexus between tangible job benefits and the acceptance or rejection of sexual advances exists, "[i]t is enough to show that the supervisor used the employee's acceptance or rejection of his advances" as the basis for an employment-related decision.  Id. at 778.  Liability for quid pro quo harassment is always imputed to the employer.  Id. at 780.

---

     [12] ISO notes that Fu did not plead a quid pro quo sexual harassment in his Complaint. Def.'s Reply at 8.  While introducing a new claim is inappropriate at the summary judgment stage, see Enzo Biochem, Inc. v. Amersham PLC, No. 02CIV8448, 2013 WL 5943985, at *4 (S.D.N.Y. Oct. 22, 2013), the court does not believe that Fu has done so here in arguing that he was subjected to quid pro quo sexual harassment.  See Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 603-04 (2d Cir. 2006) ("[W]e are hesitant to suggest a rigid rule that would require plaintiffs to use the words 'quid pro quo' or 'hostile work environment' in the district court or else be treated as having waived such claims.  Because these terms are judicially created for analytical purposes, not distinctions in the statute itself, we think it is most appropriate . . . to look to the substance of the alleged misconduct of which the plaintiff complains rather than the terms used to describe it.").

A genuine issue of material fact exists as to whether Halon's instruction to Cummings that Fu would no longer be permitted on sales calls was motivated by Fu's rejection of Halon's sexual advances.  A reasonable jury could conclude, from Halon's emails to Fu and Fu's claims that Halon invited him on unnecessary business trips, that Halon made a sexual advance to Fu, and that Fu declined said advance.  Fu has also offered evidence that Halon began criticizing Fu's work performance at some point after his sexual advances were rebuffed, and that Halon's refusal to allow Fu on future sales calls was the basis for Cummings' decision to terminate him.  See supra IV.A at 25, 27. As the court cannot resolve, as a matter of law, whether Halon used Fu's rejection of his advances as the basis for his criticism of Fu to Cummings—criticism that a reasonable jury could find was a proximate cause of Fu's termination—summary judgment is denied on Fu's quid pro quo sexual harassment claim under CFEPA.

> 2.   Hostile Work Environment

To succeed on a hostile work environment sexual harassment claim, a plaintiff must "prove that the incidents [of harassment] were sufficiently continuous and concerted to be considered pervasive . . . or that a single episode is severe enough to establish a hostile work environment."  Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir. 1999) (internal quotation marks and citations omitted).  Whether conduct was so pervasive or severe as to create a hostile work environment depends on the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993).  A hostile work

environment claim has an objective and subjective component: "[a] jury must be able to conclude that the work environment both objectively was, and subjectively was perceived by the plaintiff to be, sufficiently hostile to alter the conditions of employment for the worse." Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 604 (2d Cir. 2006).

The episodic nature of Halon's alleged harassment is fatal to Fu's hostile work environment claim. Fu has not alleged that any single incident of harassment from Halon was severe enough to alone create a hostile work environment, or that the harassment was physically threatening or humiliating. What Fu has alleged—that Halon's emails to him in July, August, and November of 2009, his wink and smile at Fu during a January 2010 in-person meeting, his unspecified number of invitations of Fu on allegedly unnecessary business trips at some point during 2010, and his October 2010 comment that Fu need not wear anything for their sales call—does not rise to the level of pervasiveness required to prove a hostile work environment claim. The instances of harassment occurred episodically over the course of a few months. See Mormol v. Costco Wholesale Corp., 364 F.3d 54, 58-59 (2d Cir. 2004) (finding that episodes of harassment were not sufficiently pervasive because they were "few and occurred over a short span of time" of nearly one month).

To violate Title VII, a workplace must be permeated with discriminatory intimidation, ridicule, and insult. Schiano, 445 F.3d at 604; see also Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) ("[O]ne of the critical inquiries in a hostile environment claim must be the environment. Evidence of a general work atmosphere . . . —as well as evidence of specific hostility directed toward the plaintiff—is an

important factor in evaluating the claim.") (citations and internal quotation marks omitted).  While the Second Circuit has cautioned that "[p]rior cases in which [it has] concluded that a reasonable juror could find that the work environment was objectively hostile do not establish a baseline that subsequent plaintiff must reach in order to prevail," Schiano, 445 F.3d at 606 (internal quotation marks omitted), the comparative infrequency and short-lived nature of Halon's sexual advances towards Fu convince the court that no reasonable jury could find that this conduct was pervasive.  See Holtz v. Rockefeller & Co., 258 F.3d 62, 75-76 (2d Cir. 2001) (finding a triable issue where a supervisor touched the plaintiff on a "daily" basis, "constantly," "whenever he had the opportunity," over the course of "months and months"); Raniola v. Bratton, 243 F.3d 610, 621 (2d Cir. 2001) (finding a triable issue where a plaintiff proffered evidence that she was subjected to harassment "within the space of two and a half years time"). Thus, though it appears that Fu may have subjectively felt Halon's conduct to be hostile, as he claimed that Halon's overtures made him so uncomfortable that he was unwilling to travel with Halon and was therefore unable to demonstrate his abilities in person at sales calls, the court cannot conclude that a reasonable jury could find that Fu's work environment was objectively hostile.  Summary judgment is granted on Fu's hostile work environment CFEPA claim.

## V.   CONCLUSION

For the aforementioned reasons, ISO's Motion for Summary Judgment (Doc. No.40) is **DENIED** on Fu's CFEPA claims for sexual orientation discrimination and quid pro quo harassment and **GRANTED** on Fu's hostile work environment sexual harassment CFEPA claim.

**SO ORDERED.**

Dated at New Haven, Connecticut this 31st day of March, 2014.

/s/ Janet C. Hall_____

Janet C. Hall
United States District Judge